UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DUSTIN NARROD,

                        Petitioner,

        -vs-                                        **No. 07-CV-6071(VEB)**
                                                   **DECISION AND ORDER**
SUPERINTENDENT NAPOLI, Southport
Correctional Facility,

                        Respondent.
_____

## I.      Introduction

Acting *pro se*, Dustin Narrod ("Narrod" or "Petitioner") has filed a petition for a writ of

habeas corpus under 28 U.S.C. 2254 challenging the constitutionality of his detention in state

custody pursuant to a judgment of conviction entered against him, following a jury trial, on

charges of second degree (intentional) murder and third degree arson.

The parties have consented to disposition of this matter by a magistrate judge pursuant to

28 U.S.C. § 636(c)(1).

## II.     Factual Background and Procedural History

### A.      The Trial

Eight-three-year-old Jean McAllister ("McAllister" or "the victim") was last seen alive on

the afternoon of July 31, 2000. One of her neighbors saw her sometime between 4:00 and 4:30

p.m. sweeping her driveway on the corner Manitou Road and Peck Road in the Town of Parma

(Hilton). T.333.[1]

_____

[1]          Citations to "T.___" refer to pages from the trial transcript.

-1-

On Friday, August 4, 2000, McAllister's sister-in-law, Betty Twilliger ("Twilliger") called McAllister's house before stopping by to take her grocery shopping, as was Twilliger's custom. However, each of the three of more times she called, she heard a busy signal, which was unusual. T.357-59. Twilliger went to McAllister's house. When she was unable to gain entrance through the kitchen door, she went to the front door which was ajar (McAllister usually kept the front door open, with the screen closed, in the summer when she was home.) Upon entering, Twilliger immediately realized there had been a fire. T.360-62. She could not find McAllister in any of the main floor rooms, and the bedroom was "all burnt up."

Twilliger enlisted the help of a neighbor, who telephoned the fire department. T.367-68, 379, 382, 385-86. The firefighters found no active fires burning. McAllister, however, lay dead in the furnace room in the basement. T.418, 421.

McAllister's body was "burned very, very badly" and the "whole left side [of her body] had received terrible burns." T.526. McAllister's body had been charred beyond visual recognition; she was identified by her dental records. T.723. There were a number of matches scattered on her corpse and sitting next to her were a bottle of charcoal lighter fluid and smoke detector with the 9-volt battery removed. T.526. The victim's head was covered with a towel, and a white rope was draped around her upper torso. T.526. Wooden matches were on the ground surrounding her and there were newspapers on top of, under, and around her. T.526, 532. On top of the body lay a green suitcase containing silver dollars, half dollars, a roll of coins, and a cigarette butt. T.644. Another cigarette butt was recovered from the fire debris surrounding the corpse. T.639.

The medical examiner found that McAllister had several lacerations on her skull,

indicating blunt force trauma. T.967-68. The skull showed multiple fractures and, internally, there was a laceration of the brain directly underneath, as well as some hemorrhaging over one of the layers of the outer surface of the brain. T.972. The broken bone in the skull was displaced inward away from its normal location. T.973. The injuries indicated that McAllister had received at least four blows of considerable force with some type of blunt instrument. T.973-74. There was bruising on the right deltoid, indicating some trauma to the shoulder. T.970.

In addition, there were two stab wounds to the neck. T.967-68. A steak-knife blade with the handle missing was found embedded in the cervical neck area. T.636-38, 953. There were no petechial hemorrhages which typically are found in asphyxia cases. This led the medical examiner to rule out strangulation as a factor in McAllister's death, the cause of which was determined to be blunt force truama to the head. T.977.

A pattern of blood spatters at the base of the stairs was consistent with the victim being struck repeatedly with an instrument while lying on the floor there. T.615. Behind the stairwell was found a knife handle that matched the blade embedded in the victim's neck. T.640-41. A trail of blood led from the bottom of the stairs, through to the furnace room where McAllister's body was found. T.532-33.

Beside the trail of blood stood a partially consumed bottle of "Tahitian Treat" soda. T.534

When the soot was removed from the basement floor, the investigators found bloody shoeprints underneath. T.669. Examination revealed that they were consistent with the tread pattern of men's size 9 ½ Dexter brand shoes, either the "Explorer" or "Excursion" style. T.1094-96. Narrod wears size 9 ½ shoes and was known to wear shoes of that style. The search of his house revealed two (2) pairs of Dexter shoes and four (4) Dexter shoeboxes. T.699, 867-68, 879-

80. *See also* Property Custody Report, submitted as part of Respondent's Appendix of State Court Records ("Resp't App."), which is unpaginated.

A check of the telephone records revealed that McAllister's phone line had gone dead at exactly 1:30:39 a.m. on August 2, 2000. T.479. At some point before that time, the wall-mounted phone in McAllister's basement had burned off and fallen onto the fire debris on the floor. T.525. A telephone company technician stated that a wall-mounted phone being burned in that manner could definitely cause the "hard short" out-of-service message found in McAllister's phone records. T.479. Anyone calling McAllister's number after the "hard short" would get a busy signal, as Twilliger had gotten when she called on August 4, 2000. T.479. No service calls were made on McAllister's phone line after 1:30 a.m. on August 2nd. T.480. The time of fire was thus determined to be August 2, 2000, at 1:30 a.m. Because the victim's airway contained no soot, the medical examiner determined that she was already dead when the fire was started. T.975.

There was additional physical evidence recovered on the main floor of the house. On the dining room table stood an orange juice container; both the container and the table were smoke-damaged and completely covered with soot. T.500. There was no soot underneath the container. Three cigarette buts were floating in the remaining orange juice. T.629.

In addition to the two fires in the basement, there was evidence of five (5) fires upstairs. In the livingroom, there had been a fire on one wall by a large window, which incinerated the draperies and melted a TV and VCR. T.492-93. The hallway carpeting had a burn-pattern. T.504. Evidence of three (3) separate fires was found in the master bedroom. One had started on the bed and had traveled up the headboard onto the wall and ceiling. T.516-17. A second had started on the floor between two dressers and continued up the wall. T.517. Another had been started

inside one of the dresser drawers. T.517.

The arson investigator concluded that the fires had begun burning very fast and hot. They produced a great deal of soot and smoke, but quickly sucked up all the available oxygen and, consequently, burned themselves out. T.536-37. The carpet and carpet padding were found to contain remnants of gasoline and a medium petroleum distillate. T.1123. The towel found draped on the pool table in the basement, as well as a piece of rug from under the victim's body, also contained a medium petroleum distillate. T.1120. The contents remaining in the bottle of charcoal starter fluid was analyzed and found to be a medium petroleum distillate consistent with that found in the carpet, carpet padding, towel, and rug samples. T.1129-30. Gasoline was found in the draintrap of the bathroom sink. T.1127-28.

The police investigated a number of suspects, including one Frederick Allen Taylor ("Taylor"). As part of their canvass of the neighborhood, the police interviewed Narrod on August 24, 2000. T.546. Narrod stated that he had no information about the incident, that he did not know McAllister, that he had never been over to her house or inside her house, and that he had never done any work for her. T.551-52.

In the meantime, several weeks after the August 2000 murder, Narrod was hanging out with some friends. Someone asked him "if he thought it was weird that somebody had been killed right down the street from him." T.575, 580. Narrod responded that it did not seem weird to him and that "somebody had tried to go back and set the house on fire and they didn't find the body for two days." T.575. The police discovered, after reviewing all of the information disseminated by the press and media at the time of the crime, that the sheriff's department merely had said that McAllister had been killed sometime between July 30th and August 4th. T.1006,

1018. Thus, it was only through first-hand knowledge that Narrod could have known that McAllister's body was not discovered until two days after the blaze.

According to Narrod's friends, he had also told them that the police had questioned him about the murder because he had walked past McAllister's house on the night of the murder. T.578-79. However, the police did not know whether he had walked past the victim's house. Furthermore, the police did not state to him that was why he was being questioned. T.546-48.

On September 16, 2000, about a month and a half after the murder, Narrod was arrested for several unrelated, non-violent felony offense for which he faced a maximum possible sentence of two and two-thirds to eight years in prison. T.872. Curiously, at the end of October or the beginning of November, Narrod wrote a letter to an ex-girlfriend in which he stated, "I guess by now you probably heard I was arrested for a lot of things and I'm in very big trouble. You were right about my drug addiction, I just never seen [sic] it. I'm looking at 25 years in a [sic] upstate prison." T.871. At that time, Narrod had not been arrested in connection with the McAllister murder. He did not face anywhere near twenty-five years on the non-violent felonies on which he was being held. However, twenty-five years is a not uncommon sentence for intentional, felony, or depraved indifference murder.

On May 15, 2001, the Monroe County Sheriff's Office interviewed a woman who knew Narrod; she described him as a drug abuser (cocaine and heroin). She stated that Narrod had been observed using cocaine in a bar and was overheard stating that he was going to be in trouble for robbing an old lady. The informant felt this might have been a reference to the McAllister murder. Coincidentally, at the time of this interview, Narrod was in the county jail on a pending robbery and larceny charge. On May 22, 2001, the police collected several items from a lunch

tray discarded by Narrod and submitted them for analysis and comparison to the cigarette butts and soda bottle found at the crime scene. However, there was insufficient quantities of DNA on these items from which to glean reportable results.

On January 8, 2002, the police went to Narrod's home to speak with him. He voluntarily accompanied them to the police station and waived his *Miranda* rights. Narrod explained that he had lived on Peck Road for about ten years and had seen McAllister on only two occasions–one time when she was shoveling snow, and another when she was getting her mail. T.1004. Narrod stated that he had never been inside her house and had never done any work for her. T.1005. He informed the investigators that his shoe size was 9 1/2. He voluntarily agreed to provide a DNA sample. T.1005.

On February 1, 2002, the police were notified that the DNA profile from the items collected at the crime scene matched Narrod's DNA profile; the results indicated that the probability of a randomly selected individual, unrelated to Narrod, having the same DNA profile, was less than one in two hundred ninety-two trillion.

On February 4, 2002, Narrod was arrested on an outstanding warrant on unrelated charges. At that time, the police had probable cause to arrest Narrod for the McAllister murder in light of, *inter alia*, the DNA results. Narrod again accompanied police officers to the station where he again waived his rights and gave a written statement. T.1047-52. With regard to McAllister, Narrod stated, "I only seen [sic] the lady shoveling her driveway once or twice. I've never been at the lady's house, I've never been in the lady's house, I don't know anything about her and have never helped her or worked for her." T.1054.

Search warrants were obtained by the police on February 13, 2002. Narrod was arrested,

and subsequently arraigned on February 15, 2002, on murder charges in the Town of Parma Justice Court. The case was presented to a grand jury which returned an indictment charging Narrod with one count of intentional murder, one count of depraved indifference murder, and one count of arson.

At trial, the defense was precluded from introducing third-party culpability evidence regarding Frederick Taylor; this is discussed further, *infra*. Narrod did not testify, and the defense called no other witnesses.

The jury returned a verdict convicting Narrod of second degree (intentional) murder and third degree arson. He was acquitted of depraved indifference murder.

## B.    Post-Verdict Proceedings and Sentencing

Trial counsel filed a motion pursuant to C.P.L. § 330.30 to set aside the verdict on the basis that the trial court had erroneously precluded the third-party culpability evidence from Fred Taylor. The trial court adhered to its original ruling, and denied the motion.

Narrod was sentenced to consecutive terms of imprisonment of twenty-five years to life for the second degree murder conviction and five to fifteen years for the third degree arson conviction.

## C.    The Direct Appeal

Represented by new appellate counsel, Narrod appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court on the same ground as he had advanced in his C.P.L. § 330.30 motion, in addition to other arguments. That court unanimously affirmed the conviction, and leave to appeal to the New York Court of Appeals was denied. Narrod filed no other post-conviction motions attacking his conviction or sentence.

**D.     The Federal Habeas Petition**

This timely habeas petition followed. For the reasons discussed below, the petition is

dismissed.

**III.     Legal Standard of Review**

Federal habeas review is available for a State prisoner "only on the ground that he is in

custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §

2254(a).  Errors of state law are not subject to federal habeas review. *See*, *e.g.*, *Estelle v*

*McGuire*, 502 U.S. 62, 67-68 (1991); *Cupp v Naughten*, 414 U.S. 141, 146 (1970).

Because Narrod's petition, filed in 2007, postdates the enactment of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (codified

as amended in scattered titles of the U.S.C.), AEDPA's revisions of 28 U.S.C. § 2254 govern the

proceeding. *Lurie v. Wittner*, 228 F.3d 113, 120-21 (2d Cir. 2000) (citing *Williams v. Taylor*, 529

U.S. 362, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389 (2000); *Lindh v. Murphy*, 521 U.S. 320,

322-23, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997); *Tankleff v. Senkowski*, 135 F.3d 235, 242

(2d Cir.1998)). The Second Circuit has summarized the requirements placed upon a habeas

petitioner by the AEDPA standard as follows:

> Under AEDPA, to prevail on a petition for a writ of habeas corpus, a petitioner
> confined pursuant to a state court judgment must show that the court's
> "adjudication of the claim ... resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).
> "[C]learly established Federal law" refers to holdings of the Supreme Court, as
> opposed to dicta, as of the time of relevant state court decisions. *Carey v.*
> *Musladin*, 549 U.S. 70, 74-75, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); *Williams*
> *v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A decision
> is "contrary to" federal law "if the state court arrives at a conclusion opposite to
> that reached by [the Supreme Court] on a question of law or if the state court

decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. An "unreasonable application" occurs when a "state court identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* "Unreasonableness is determined by an 'objective' standard." *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir.2005) (quoting *Williams*, 529 U.S. at 409, 120 S.Ct. 1495).

*Friedman v. Rehal*, 618 F.3d 142, 152-153 (2d Cir. 2010) (Korman, D.J., sitting by designation)

The Supreme Court has stated that "unreasonableness" should not be conflated with "clear error" because "[t]he gloss of clear error fails to give proper deference to state courts." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir.2001). However, "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

"[A] 'state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.' " *Jimenez v. Walker*, 458 F.3d 130, 142 (2d Cir.2006) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001) (quotation and alteration marks omitted)). Where a claim has been "adjudicated on the merits," 28 U.S.C. § 2254(d), "deference [is] mandated under AEDPA," *Sellan*, 261 F.3d at 310, in the federal habeas court's review of petitioner's claim. All of Narrod's claims have been adjudicated on the merits by the state courts.

**IV .  Analysis of the Petition**

**A.  Ground One: Violation of Petitioner's Right to Present a Defense**

In attachment to his Petition under "Ground One", Narrod lists several rulings by the trial court that he alleges violated his right to present a defense. After the overview of the pertinent law on this right, the Court will address each ruling *seriatim*.

**1.  Applicable Legal Principles**

Narrod contends that his constitutional right to present a defense was denied by the trial court's ruling precluding him from present evidence of alleged third-culpability. Narrod's constitutional right to present a complete defense at his criminal trial was clearly established at the time of the Appellate Division's 2002 decision in his appeal. *Jimenez v. Walker*, 458 F.3d 130, 146-47 (2d Cir. 2006) (citing *Taylor v. Illinois*, 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (" Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself.") (internal citation omitted); *Rock v. Arkansas*, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

In *Chambers*, the Supreme Court determined that Missouri's "rigid application of state evidentiary rules prohibiting presentation of defense evidence of third-party culpability" violated the defendant's constitutional right to present a defense. *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003).  Defendant Chambers was tried for a murder to which another individual (McDonald) had repeatedly confessed. However, "the trial court's mechanical application of the hearsay rule, coupled with Mississippi's 'voucher' rule, which prohibited the defense from cross-examining

McDonald because it had called him as a witness and thereby 'vouched' for his credibility, effectively precluded Chambers from introducing evidence of these confessions." The Supreme Court determined that Chambers had been denied a trial "in accord with traditional and fundamental standards of due process," *Chambers*, 410 U.S. at 302, as a result of combination of two factors: the trial court's mechanistic, overly rigid application of the rule against hearsay to exclude testimony by defense witnesses about McDonald's confessions, and the state prosecutor's refusal to permit Chambers to cross-examine McDonald because McDonald had already testified for the prosecution, *id*.

However, a defendant's right to present relevant evidence is not absolute. *Wade*, 333 F.3d 51 (citing *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)). Trial courts may impose "reasonable restrictions" on the introduction of proof for the defense, such as rules of procedure and evidence "designed to assure both fairness and reliability in the ascertainment of guilt and innocence," *Chambers*, 410 U.S. at 302. *Accord, e.g.*, *Wade v. Mantello*, 333 F.3d 51(citing *Taylor v. Illinois*, 484 U.S. at 410 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.")). The caveat is that those evidentiary rules must serve "'legitimate interests in the criminal trial process,' . . . and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" *United States v. Almonte*, 956 F.2d 27, 30 (2d Cir.1992) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55-56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (holding that Arkansas' *per se* rule of evidence excluding all hypnotically refreshed testimony infringed impermissibly on criminal defendant's right to testify on her own behalf).

### 2. Summary of the Evidence of Third-Party Culpability

According to the defense, Frederick Allen Taylor ("Taylor") had confessed to his lover, Talbot, that he had committed the crime. The defense asserted that Taylor had unaccountably "gone missing" during the time-period in which McAllister was killed and that other circumstantial evidence allegedly linked Taylor to the crime.

At the time of the murder/arson, Taylor lived off and on at Talbot's house, but they argued frequently and Taylor often went off on "benders" and would disappear for long stretches of time. Talbot had a history of calling the police when Taylor would leave him.

Talbot initially reported Taylor missing at around the time of the McAllister murder. When he called the police, he stated that Taylor had been with him continuously until August 2, 2000, at 4:30 p.m., at which time Taylor left without saying where he was going.

The following day, on August 3, 2000, at 12:55 a.m., the police stopped a shirtless, inebriated Taylor as he was walking on the shoulder of Manitou Road, not far from the victim's home. When asked where his shirt was, Taylor said that he had taken it off but did not indicate where he had left it. An unidentified men's t-shirt was found in the basement of the victim's home. The defense argued that this t-shirt linked Taylor to the crime scene, given the circumstance that he was found walking without a shirt in the vicinity of McAllister's home. However, there was never any forensic evidence linking the t-shirt to Taylor or Narrod or anyone else for that matter.

In September of 2000, Taylor walked out on Talbot another time. Talbot filed two sets of robbery charges against Taylor and had him arrested. At that time, Talbot called the police again. Talbot "claimed that Taylor had been drinking heavily during this time [i.e., after September 7, 2000, when Taylor got out of jail on an unrelated charge] and on one occasion, while intoxicated,

Taylor said that he had pushed/shoved and choked the old lady on Manitou Rd.  He also claimed

that he was a 'choke artist'." Monroe County Sheriff's Department Report Addendum, by

Investigator K. Garvey, attached as part of Resp't App.

### 3. Analysis of the State Court's Decision Excluding the Evidence

#### a. Whether the Evidentiary Decision Amounted to Constitutional Error

As the Second Circuit observed in *Wade v. Mantello*, "[t]he Constitution protects a

criminal defendant from the arbitrary exclusion of material evidence, and evidence establishing

third-party culpability is material." 333 F.3d at 58. Therefore, I must proceed to consider whether

the State court's decision to exclude the Fred Taylor evidence was  "an unreasonable application

of" this clearly established law, or was "contrary to" this law. *Id.*

In adjudicating Narrod's claim, the Appellate Division, although it did not explicitly

acknowledge a criminal defendant's general right to present a defense, did not reach a different

conclusion than the Supreme Court on a question of law or arrive at a different decision than the

Supreme Court on "materially indistinguishable" facts. *Wade*, 333 F.3d at 58 (citing *Chambers*,

410 U.S. at 303 (stating that defense evidence must be admitted when, under the "facts and

circumstances" of the individual case, its exclusion deprived the defendant of a fair trial).

Accordingly, I must conclude that the State court's decision was not "contrary to" Supreme Court

precedent. *Wade*, 333 F.3d at 58 (citing *Williams v. Taylor*, 529 U.S. at 412-13.

I therefore turn to Section 2254(d)(2) and ask whether the State court's evidentiary ruling

was an "unreasonable application" of clearly established Supreme Court law. *Wade*, 333 F.3d at

58-59. Here, the Appellate Division rejected Narrod's claim not because the excluded evidence,

if admitted, would not have created reasonable doubt, but because it found that the trial court properly excluded the testimony after applying the appropriate balancing test. As a consequence, habeas relief may not be granted unless this determination was objectively unreasonable. *Wade*, 333 F.3d at 59 (stating that where the state court did not determine whether the excluded evidence was material, but rather determined that the evidence was properly excluded, the question under AEDPA was whether that decision was objectively unreasonable). If the habeas court finds some error in this decision, then it should proceed to consider the materiality of the excluded evidence. *Id.* at 59-60. Only if the excluded evidence was material does the trial court's error become one of constitutional magnitude so as to deprived the habeas petitioner of a fundamentally fair trial. *Id.*; *see also Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000); *Washington v. Schriver*, 255 F.3d at 59, *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983).

Narrod argues that the trial court held the proffered third-party culpability evidence to a much higher standard, requiring it to be not only probative, but such that it established a "clear link" between the third-party and the crime in question. In doing so, Narrod argues, the trial court violated his fundamental right to present a defense. Narrod is correct that the "clear link" formulation for determining admissibility was expressly disavowed by the New York Court of Appeals in *People v. Primo*, 96 N.Y.2d 351 (N.Y. 2001). *Primo* began by observing that the intermediate appellate courts in New York "employ the 'clear link' standard, rather than couching their review in terms of weighing probative value against countervailing risks[.]" which "merely reinforce[s] the notion that remote evidence of a third party's culpability-though relevant-will not be sufficiently probative to outweigh the risk of trial delay, undue prejudice or jury confusion." *Id.* at 356. The *Primo* court noted that "[t]o the extent that the 'clear link'

standard implies no more than an abbreviation for the conventional balancing test, it presents no problem" and opined that "[a] review of clear link cases reveals that the courts would very likely have made the same ruling regardless of the nomenclature." *Id.* However, because "'[c]lear link' and similar coinages . . . may be easily misread as suggesting that evidence of third-party culpability occupies a special or exotic category of proof," *Primo* held that the "better approach . . . is to review the admissibility of third-party culpability evidence under the general balancing analysis that governs the admissibility of all evidence." *Id.* at 357. That is, the probative value of the evidence should be weighed against its potential for confusing the jury, delaying the proceeding, or prejudicing the opposing party. *Id.* The *Primo* court reiterated that "[t]he admission of evidence of third-party culpability may not rest on mere suspicion or surmise." *Id.*

At Narrod's trial during opening argument, defense counsel attempted to discuss the Fred Taylor evidence. The prosecutor objected, stating that individuals had been eliminated through DNA testing, and that the "Court of Appeals said when you're going to put in evidence of third-party culpability, you've got to have a clear link between that third party and commission of the crime. . . ." T.321-22. As noted above, *Primo*, the case rejecting the "clear link" nomenclature, had been handed down about a year prior to Petitioner's trial.

The trial court then asked defense counsel, "What is the clear link?" T.322. Defense counsel made the following offer of proof:

> He [Fred Taylor] admitted he committed the crime to Talbot . . . . Taylor had been drinking during this time and on one occasion while intoxicated, Taylor said that he pushed, shoved and choked the old lady on Manitou Road, also claims he was a choke artist. Also, [Investigator] Siena found blood sneakers from Taylor,

Taylor's alibis were all off.[2]

T.322-23. The prosecutor responded–accurately–that the blood from Taylor's shoes did not connect him to the crime and that the cause of the victim's death was not choking. T.322-23. Defense counsel correctly pointed out that no DNA was recovered from Taylor's shoes and no comparison was possible, and that the rope found around the victim's neck at the crime scene was consistent with Taylor's "choking" claim. T.323.

The prosecutor further argued that Taylor's confession was not credible because Taylor was intoxicated at the time made the "choke artist" comment to Talbot and claimed to have "pushed, shoved and choked the old lady on Manitou Road." T.323. The trial court declined to change its ruling, telling defense counsel, "I can't resurrect a bad case for you . . . [t]he objection is sustained." T.326-27. Accordingly, defense counsel was not allowed to bring in any evidence of Taylor's alleged involvement in the McAllister murder. *Id.*

Later in the trial, when defense counsel attempted to cross-examine one of the sheriff's investigators about evidence he had collected that was never connected to Narrod. The prosecutor objected because defense counsel had not shown a "clear link" as required under *Primo*. T.441-42. Defense counsel admitted that he was not aware of *Primo*. He again argued that he should be allowed to "try to put on a defense about someone who is potentially very involved in this case," i.e., Taylor. T.446-47. Defense counsel noted that the police reports had listed him as a suspect and actually as the defendant for several months. *Id.* The prosecutor continued to argue that there

---

[2]    Although portions of the Fred Taylor evidence were speculative, covering all of the evidence with that label overlooks Taylor's purported confession to his lover, Talbot. Although Talbot had first told the police that Taylor had denied having anything to do with the murder, the prosecution could have elicited that fact and allowed the jury to judge which version was credible and whether Taylor's comments about being a "choke artist" were merely drunken exaggeration said to Talbot for their shock value.

was no "clear link" between Taylor and the crime. T.449-50. The trial court adhered to its previous ruling. T.450.

After an adjournment, trial counsel again raised the Taylor issue. The trial court asked the prosecution to put the language from *Primo* on the record. The assistant district attorney did not accurately characterize mischathe *Primo* holding by stating, "before any evidence of third-party culpability can be introduced in front of a jury, the defense must demonstrate a clear link between the third party and the crime in question." T.455. Of course, as noted above, *Primo* expressly rejected the "clear link" formulation of the admissibility standard for third-party culpability evidence. Unfortunately, it appears that defense counsel never read *Primo* and so was not in a position to correct the prosecutor.

After further argument, in which defense counsel did cite to *Chambers v. Mississippi*, 410 U.S. 284 and the constitutional right to present a defense, the trial court agreed to review a packet of discovery documents that, defense counsel believed, implicated Taylor in the crime. T.471. After reviewing the documents in chambers, the trial court again adhered to its original ruling that the Taylor evidence was inadmissible. T.652.

On direct appeal, Narrod, represented by new appellate counsel, argued that the trial court had applied the incorrect standard and had violated Narrod's constitutional right to present a defense. The Appellate Division held as follows:

> The record establishes that, regardless of the court's use of the "clear link" language, the court properly applied "the general balancing analysis that governs the admissibility of all evidence" and precluded defendant from presenting the proffered evidence because it was based on mere speculation (*People v. Primo*, 96 N.Y.2d 351, 356, 728 N.Y.S.2d 735, 753 N.E.2d 164; *see People v. Williams*, 291 A.D.2d 897, 897-898, 737 N.Y.S.2d 737, *lv. denied* 97 N.Y.2d 763, 742 N.Y.S.2d 624, 769 N.E.2d 370; *People v. Joaquin*, 242 A.D.2d 589, 590, 664 N.Y.S.2d 735,

> *lv. denied* 91 N.Y.2d 893, 669 N.Y.S.2d 7, 691 N.E.2d 1033).

*People v. Narrod*, 23 A.D.3d at 1062. This Court is not as sanguine as the Appellate Division, for it appears to this Court that there is no basis for concluding that the trial court did not apply the "clear link" standard rejected by the New York Court of Appeals in *Primo*. Moreover, this Court does not discern any reference to the general balancing test that weights probative value against deleterious effects on the proceedings, such as prejudice, delay, and confusion. Nor can such a balancing be implied from the record. The prosecutor argued, incorrectly, that *Primo* espoused the "clear link" standard; defense counsel, because he had not read *Primo*, could not counter that misrepresentation. Even after being provided with a copy of *Primo* by the prosecutor, it appears that trial counsel adopted the "clear link" phraseology or at least did not dispute it. And, the trial court appropriated the prosecutor's "clear link" language when it asked defense counsel to explain to demonstrate the "clear link" between Fred Taylor and the McAllister crime. This Court accordingly is concerned by the trial judge's "failure to articulate the countervailing risks of admission, while apparently relying on a state court evidentiary rule that has raised serious constitutional doubts." *Ramos v. Phillips*, 2006 WL 3681150, at *7 (E.D.N.Y. Dec. 12, 2006) (citing *Sparman v. Edwards*, 26 F. Supp.2d 450, 472-73 (E.D.N.Y. 1997) (District Judge Gleeson had questioned the "clear link" test's constitutionality, but determined that a habeas court was limited to determining whether the test's application had led to an unconstitutional result); *Wade v. Mantello*, 333 F.3d at 62 (The Second Circuit "doubt[ed], although [it] ha[d] no occasion to decide it here, whether categorically requiring evidence of third-party culpability to meet a heightened showing of probity comports with the constitutional guarantee of the right to present a complete defense").

Given the present record I am compelled to conclude that the trial court applied a heightened standard of probity–the disavowed "clear link" standard–rather than the general balancing test that has been employed by the Supreme Court in its seminal cases on the right to present a defense, such as *Chambers* and *Crane*.  Although the "Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues,'" *Crane v. Kentucky*, 476 U.S. at 689 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (alterations in original), the Constitution does not separate third-party culpability proof into a special category requiring demonstration of a higher standard of probity.

Here, the prosecution did not establish that the evidence was repetitive or only marginally relevant; indeed, evidence that a person other than the defendant is guilty is necessarily relevant. Nor did the evidence pose a risk of harassment; the possible risk of prejudice or confusion of the issues was not unduly strong, and it could have been addressed by what the Court is sure would be forceful cross-examination by the prosecutor. Rather than properly focusing on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt, the trial court erred in holding the defense to a higher standard of proof than the Supreme Court has ever required, *see Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (collecting cases). The State courts in Narrod's case thereby unreasonably applied clearly established Supreme Court precedent concerning the right to present a complete defense.

### b.      Harmless Error Analysis

This does not end the analysis for on habeas review, a constitutional error must be found to not have been harmless in order for relief to be warranted.   "For the exclusion of evidence to

violate this right by denying the accused a fundamentally fair trial, the evidence must be 'material,' in the constitutional sense that it 'creates a reasonable doubt that did not otherwise exist' as evaluated "in the context of the entire record.'" *Jimenez*, 458 F.3d at 147 (quoting *United States v. Agurs*, 427 U.S. 97, 112-13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). The Supreme Court observed in *Agurs* in discussing the materiality of evidence withheld by the prosecution, "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." 427 U.S. at 112-13; *accord, e.g., Jimenez*, 458 F.3d at 147. However, as the High Court cautioned in *Agurs*, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113; *accord, e.g., Jimenez*, 458 F.3d at 147. " If excluded evidence would create otherwise nonexistent reasonable doubt, its exclusion satisfies the 'substantial and injurious' reversible-harm standard" set fort in *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which is applicable to assessing harmlessness of trial errors on habeas review. *Jimenez*, 458 F.3d at 147 (citing *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

 In explaining how the excluded evidence's materiality relates to the standard for constitutional error, the Supreme Court has stated that

> [t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a

reasonable doubt.

*United States v. Agurs*, 427 U.S. 97, 112-13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

Evaluating the omission of the Fred Taylor evidence in light of the entire record, it is clear that would not have created an otherwise nonexistent reasonable doubt. First, I note the lack of biological/forensic evidence linking Taylor to the crime, in comparison to the prosecution's compelling forensic evidence (DNA and fingerprints) placing Narrod at the scene of the murder and arson. Taylor voluntarily submitted to a DNA sampling procedure, and his DNA, along with his fingerprints, were compared to the DNA and fingerprints taken from the various items (e.g., the lighter fluid bottle, the cigarette butts) retrieved from the crime scene. Neither Taylor's DNA nor his fingerprints matched any of the DNA or fingerprints on the physical evidence.

Second, contrary to defense counsel's contention, Taylor's alibis were not "all off." The prosecution produced convincing proof at trial that the fires were set at 1:30 a.m. on August 2, 2000, since that is when the phone service to the victim's house was interrupted, an event which could have been caused by a phone being burnt off a wall–as was the case with the phone in the victim's basement. The medical evidence established that the victim was already dead at the time the fires were started. Thus, the compelling inference is that the time of death was at or before 1:30 a.m. on August 2, 2000. Talbot, Taylor's lover, accounted for Taylor's whereabouts up until 4:30 p.m. on August 2, 2000. Based upon Talbot's statements and the physical and medical evidence, Taylor could not have killed McAllister or set fire to her house because he was with Talbot at the relevant time.

Third, even accepting as true that Taylor, while drunk, told Talbot that he was a "choke artist" and had "pushed/shoved and choked" the "old lady on Manitou Rd.", that statement does

not jibe with the evidence regarding the cause of death. The medical examiner testified that there was no indication that the victim had been choked. Rather, she had been repeatedly stabbed and beaten with a blunt instrument. Taylor did not mention anything about the victim having been beaten or stabbed. In contrast, Narrod told his friends certain things that only the murderer/arsonist could have known.

Furthermore, Taylor's alleged confession was made more than a month after the murder, sometime between September 7 and September 21, 2000, to his lover who had recently had him arrested for robbery. *See* Addendum by Investigator Garvey at p. 19, Appendix on Appeal at 166 (attached as part of Respondent's Appendix of Exhibits). It was only after Talbot had filed two sets of charges against Taylor after one of their break-ups, that Talbot had gone to the police with the allegation that Taylor had told him that he (Taylor) was "choke artist" and had "pushed/shoved and choked" the "old lady on Manitou Rd." Closer in to the incident, on August 24, 2000, Talbot directly asked Taylor if he was involved in the McAllister case, and Taylor denied it. At the time, Taylor also was intoxicated; however, Talbot told the police that he believed Taylor's denial of involvement because Taylor usually told him the truth when he was intoxicated. *See* Addendum by Investigator Garvey at p. 19, Appendix on Appeal at 178 (attached as part of Respondent's Appendix of Exhibits). As the trial court observed, this statement made while Taylor was intoxicated after getting out of jail in September 2000, was "perhaps braggadocio," T.326, but, in this Court's opinion, it was not a credible, true confession to the McAllister murder

Importantly, Taylor's DNA was tested and it did not match any of the physical evidence recovered at the crime scene, such as the cigarette butts. Nor did the fact that Talbot observed

blood on Taylor's sneakers on August 5, 2000, after Taylor had returned from his "lost weekend" connect Taylor to the crime scene. Klein, an acquaintance of Taylor with whom Taylor had spent time while he was away from Talbot's home on August 3rd and 4th, stated that Taylor had no blood on his clothing or sneakers on August 3, 2000. Most important with regard to the sneakers is that the bloody shoeprints left at the murders scene were not sneaker prints; rather, they were made by Petitioner's size 9½ Dexter-brand "Explorer"- or "Excursion"-style shoes.

Nor does the evidence of the ammonia-impregnated clothing connect Taylor to the McAllister murder. Taylor related that on August 3, 2000, he bought some clothes from a thrift store which he stated was on Lake Avenue; he threw his old clothes in the dumpster outside. The defense proffered the testimony of employees from a thrift store in the nearby area, but not on Lake Avenue, that they had found a bag of clothes smelling of ammonia on the morning of August 2, 2000. According to the defense, the murder scene smelled of ammonia. However, these events have no relation to each other. The clothes found by the employees could not have been deposited by Taylor on the morning of August 2, 2000, because Taylor was with Talbot until 4:30 p.m. on August 2, 2000, and did not go to a thrift store–assuming that he went to one, because no such thrift store was located on Lake Avenue–until the next day.

**B.      Ground One (Continued): Erroneous Limitation on Cross-Examination of Fingerprint Expert**

Narrod contends that his Sixth Amendment right to present a complete defense and right of confrontation was denied by the trial court's limiting of trial counsel's cross-examination of the prosecution's fingerprint expert, Investigator Hildreth, a police evidence technician.

Investigator Hildreth testified regarding a latent fingerprint–which was about 20% of a

full print–found on the lighter fluid bottle. T.714. The print examined did not contain any distinctive "loops" or "arches". T.783. When the police subsequently tested the lighter fluid bottle for the presence of blood, the latent print was destroyed. T.715. Investigator Hildreth testified about his comparison of the latent print to Narrod's inked prints, explaining that he compared them, side-by-side, using a magnifying glass to look for similar characteristics. T.712. Investigator Hildreth could not say how many points of similarity he discerned between the latent print and inked print and admitted that it was not departmental policy to record the number of points found. T.713, 784. Investigator Hildreth opined that the latent print matched Narrod's inked print. T.718-19.

On cross-examination, defense counsel sought to elicit the fact that the latent print did not contain enough "ridge detail" to run it through SAFIS, New York's State Automated Fingerprint Identification System, for potential matches. The prosecutor objected, stating that SAFIS "has never passed a *Frye* test in terms of being admissible in court", that there was no foundation for the testimony, and that "SAFIS is a tool that's used to give fingerprint examiners possible prints to then make a comparison from. It is not a tool that's used to make identifications. It's just simply not reliable. We [the prosecution] can never come into court and say, oh, this is his fingerprint based on results from SAFIS." Defense counsel explained that he did not intend to use it for purposes of identification but rather to show the deficiencies in the latent print that was used to link Narrod to the crime. Defense counsel stated, "you have to put in general characteristics for the [SAFIS] computer to punch potential fingerprints out" but "[i]n this particular case, he didn't have enough detail to even program the system." T.787-88. The prosecutor further objected that this line of questioning was not relevant; the prosecutor stated

that he had no objection to questions about the lack of detail in the print, which he commented that defense counsel did bring out. The trial court ruled without explanation that the objection was sustained, and directed defense counsel to "move on" to another topic. T.787-88. On direct appeal, the Appellate Division summarily rejected the claim concerning the limitation on the cross-examination of Investigator Hildreth as without merit.

"[T]he right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." *Pointer*, 380 U.S. at 404. "The right of cross-examination, though not absolute, is one of the most firmly established principles under Supreme Court law." *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir.2003). "Not inconsistent with a defendant's right to confrontation, 'trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). "The right of cross-examination . . . is implicit in the constitutional right of confrontation, and helps assure 'the accuracy of the truth-determining process.'" *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (quoting Dutton v. Evans, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)). Accordingly, "[l]imitations on cross-examination may be lawful and legitimate if they are harmonious with the goal of ensuring the legitimacy of the truthfinding process." *Howard*, 406 F.3d at 129. In short, the right to cross-examination–although not absolute–"is effectively denied when a defendant is prohibited from 'expos[ing] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw

inferences relating to the reliability of the witness.'" *Id.* (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).

The Court turns first to the issue of whether the proposed cross-examination was proper. As noted above, the prosecution objected because SAFIS had not passed the *Frye* test for determining the admissibility of scientific evidence. However, defense counsel was not attempting to elicit testimony about the results of a SAFIS analysis but rather was attempting to show that the latent fingerprint analyzed by Investigator Hildreth was not complete enough to run through SAFIS. In other words, defense counsel wanted to show that a computer system that is used by law enforcement to generate potential fingerprint matches could not be utilized in this case due to the lack of completeness of the latent fingerprint found at the crime scene.

On appeal, although continuing to argue that the cross-examination was impermissible because SAFIS had not passed the *Frye* test, the People's attorney conceded that testimony "regarding the institution and mechanics" of SAFIS had been admitted in at least one case–at the prosecution's request–because it was necessary to explain why the police apprehended the defendant after a lapse of many years. *People v. Myers*, 220 A.D.2d 272, 273 (App. Div 1ˢᵗ Dept. 1995). That is essentially what defense counsel wanted to question Investigator Hildreth about–the "mechanics" of the SAFIS system, not its accuracy in matching fingerprint samples. Thus, this Court believes that whether SAFIS had passed muster under *Frye* was not the issue. The prosecutor's objection on this basis was inapposite and irrelevant–although it apparently persuaded the trial judge. The proposed cross-examination was another avenue by which defense counsel could attempt to undermine the quality of the fingerprint evidence upon which Investigator Hildreth based his expert opinion. The Court recognizes that a trial court may

impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. The proposed subject of questioning was relevant. The only concern that arguably arose here was potential "confusion of the issues", but that could have been dealt with by means of a limiting instruction, and the prosecutor easily could have conducted a re-direct examination of Investigator Hildreth to elicit the limitations of SAFIS.

However, even if there was error, it was harmless. Any violation of the Confrontation Clause is "subject to harmless error analysis." *VanArsdall*, 475 U.S. at 684. "Whether an unconstitutional limitation on a defendant's cross-examination of a witness is harmless 'depends upon a host of factors' which 'include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Howard*, 406 F.3d at 134 (quoting *Van Arsdall*, 475 U.S. at 684).  Here, two factors weigh so heavily in favor of harmlessness that the Court is compelled to conclude that in that any limitation on the cross-examination of the fingerprint expert did not have a substantial and injurious effect on the verdict–the overwhelming strength of the prosecution's case and the fact that defense counsel's cross-examination of Investigator Hildreth was not otherwise cabined. Accordingly, this claim does not warrant habeas relief.

### C.     Ground One (Continued): Denial of Request for Adjournment

Narrod further contends that his right to present a defense was violated by the trial court's denial of trial counsel's request for an adjournment, about one week before the commencement

of trial, so that the defense's DNA expert could review certain discovery related to the DNA evidence.  On appeal, however, Narrod merely argued that the trial court had abused its discretion. This claim was summarily denied as without merit by the Appellate Division on direct appeal. A habeas court is "constrained under AEDPA to assume that the Appellate Division's decision was the product of considered judgment." *Drake*, 321 F.3d at 344 (citing 28 U.S.C. § 2254(d)).

Whether to grant or deny a "continuance 'is a matter "traditionally within the discretion of the trial judge."'" *Drake*, 321 F.3d at 344 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964) and citing *Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983)).  In *Drake*, the trial court refused to grant a two-week continuance during petitioner's jury trial for defense counsel to find a psychologist to provide testimony in rebuttal to the prosecution's expert. Trial counsel made the request for a continuance after searching unsuccessfully over a weekend recess for an psychologist with the expertise required.  The prosecution opposed the continuance and the trial court denied the defense request, for reasons that are not stated in the Second Circuit's opinion in *Drake*. The Appellate Division summarily affirmed the trial court's ruling. The Second Circuit implied that the ruling was erroneous, but not unreasonable in light of the fact that petitioner had "identifie[d] no Supreme Court authority that would command either the two-week continuance in a jury trial, or a new trial by reason of its denial," *id.* at 344.[3] Although the trial court certainly could have granted a shorter continuance than requested, the Second Circuit found that it did "not appear to be an unreasonable application

---

[3]     The Second Circuit implied that the trial judge erred in refusing to grant any continuance when it noted that "[u]nder AEDPA, a reasonable application of Supreme Court precedent includes an application of law that we consider to be erroneous." *Id.* (citing *Williams*, 529 U.S. at 411).

of federal constitutional law to fail to provide a shorter continuance than requested." *Id.*

Comparison of *Drake* with the factual scenario here compels the conclusion that the trial judge did not abuse his discretion and that the denial of the adjournment did not abridge Narrod's Sixth Amendment and Fourteenth Amendment rights. Respondent points out that the Supreme Court has held that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the [Constitution]." *Morris*, 461 U.S. at 12 (quoting *Ungar*, 376 U.S. at 589); *accord Drake*, 321 F.3d at 344. Respondent points out that Narrod conceded on appeal that most of the documentation provided to the defense, which prompted the request for an adjournment, consisted of *Rosario* material (i.e., statements of witnesses) which the prosecution was not required under State law to provide to the defense until after jury selection. *See* N.Y. Crim. Proc. Law § 240.45; Pre-Trial Hearing Minutes at 3-4. Moreover, the contents of the material should not have been a surprise to the defense, since the documents were the forensic DNA expert's notes dealing with the DNA testing of the cigarette butts found in the orange juice container and the blood found on the basement floor tile. About six months prior to trial, the prosecution had turned over DNA testing results on two of the three cigarette butts found in the juice container; the new results "simply indicate[d] that a partial DNA profile of the defendant was found on all three butts." Pre-Trial *Sandoval* Hearing at 4. The results from the DNA tests of the the blood found on the basement floor confirmed that it belonged to the victim. *Id.* at 5. Finally, there was the DNA test results from a swab of neighbor Cade Lemcke which eliminated him as a possible donor of any of the previously-tested DNA on evidence found at the crime scene. T.11. Thus, as Respondent argues, there was nothing unexpected contained in the documents forming the basis for the adjournment request, and the

trial court did not abuse its discretion in determining that it was not a "justifiable request for delay[,]" *Ungar*, 376 U.S. at 589. Review of the trial transcript does not support a contention that Narrod was prejudiced by the failure to grant the adjournment, since defense counsel vigorously and adroitly cross-examined the prosecution's three DNA experts. Narrod has not suggested any way in which additional time would have improved defense counsel's cross-examination.

**D.      Ground Two: Exclusion of Evidence of Third-Culpability**

This allegation repeats an allegation made under Ground One. The reader is referred to the Court's discussion of this issue, *supra*.

**E.      Ground Two (Continued):   Erroneous Qualification of Investigator Hildreth as a "Bloodstain Pattern Recognition" Expert Witness**

Narrod contends that the trial court erred in determining that Investigator Hildreth was qualified to give an expert opinion on the blood spatter evidence from the murder scene. *See* T.594-95, 609, 614. On direct appeal, this claim was only argued based upon New York State law concerning the exercise of a trial judge's discretion in qualifying an expert witness. Although Narrod now frames this claim as one of constitutional dimension, his objections are essentially matters of state evidence law and not cognizable on habeas review unless any error rendered the trial fundamentally unfair. *Peterson v. Greene*, 2008 WL 2464273, at *6 (S.D.N.Y. June 18, 2008) (rejecting claim in 2254 habeas petition that expert witnesses was improperly allowed to testify beyond the scope of their knowledge and expertise, to assume facts not in evidence, and to state their opinions upon the ultimate facts in issue) (citing *Estelle*, 502 U.S. at 67)). As appellate counsel's argument on direct appeal implicitly recognized by its citation to only New York state court decisions, "both federal and state law confide the qualification and questioning of expert

witnesses to the discretion of the trial court." *Peterson v. Greene*, 2008 WL 2464273, at *6

(citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999); *People v. Lee*, 96 N.Y.2d 157,

162 (2001); *DeLong v. Erie County*, 60 N.Y.2d 296, 307 (1983)). Narrod's "quibbles with the

trial court's rulings," *Peterson*, 2008 WL 2464273, at *6, do not establish either an abuse of

discretion or a fundamental unfairness of the trial itself. This claim accordingly does not warrant

habeas relief.

### F.  Ground Two (Continued): Limitation on Cross-Examination of Fingerprint Expert

This allegation repeats an allegation made under Ground One, which is discussed in the

preceding section.

### G.  Ground Two (Continued): Erroneous Admission of Expert Testimony by the Arson Investigator

At trial, the prosecution called arson investigator James Rothfuss to testify concerning the

nature and origin of the fires.  With regard to the burn pattern observed in the hallway,

Investigator Rothfuss testified that "there was nothing that would cause–no accidental fire causes

that would make a burn pattern like this . . . . The burn pattern on the carpet was consistent with a

flammable liquid being . . . poured on the carpeting, then ignited. T.504-05.  Defense counsel

objected that the investigator was improperly opining that the fire was intentionally set and not

the result of accidental causes, and thereby was invading the province of the jury. This objection

was overruled. The trial court noted that the investigator could testify within his area of expertise.

Then, with regard to the fires in the bedroom, the arson investigator testified,

So after eliminating all accidental fire causes, these three fires . . . were consistent
with a flammable liquid being introduced and then being ignited through
introduction through [sic] an open flame.

T.518. Defense counsel's objection was overruled.

As to the fire damage found at the bottom of the basement stairs, the arson investigator testified

> [A]ll accidental fire causes were eliminated. This fire on the floor on the basement was a very fast fire. To burn from the floor up the wall and continue up the wall into the ceiling and burn the ceiling tiles and that [sic] the floor joists, you had a very fast and rapid fire, which would be consistent with a flammable liquid being introduced . . . .

T.525. Defense counsel's objection was overruled.

Finally, as to the fire damage in the furnace room, around the victim, the arson investigator testified,

> [T]here was no structural damage at all in the utility room, no other sign of fire except for on and around the victim [which] eliminated, again, accidental and natural causes, and this fire on the victim is consistent with a flammable liquid being introduced on and around the victim and then ignited through introduction of an open flame.

T.527. Defense counsel's objection was overruled.

On direct appeal, the Appellate Division agreed with Petitioner that  the trial court had erred in allowing the arson investigator to testify that he had ruled out accidental causes of the fire, "inasmuch as the expert's testimony improperly invaded the jury's province[.]" *People v. Narrod*, 23 A.D.3d 1061, 1062 (App. Div. 4th Dept. 2005) (citations omitted). The Appellate Division concluded that the error was harmless since "the evidence of defendant's guilt [was] overwhelming" and therefore there was "no significant probability that absent the error the jury would have acquitted defendant." *Id.* (citing, *inter alia*, *People v. Crimmins*, 36 N.Y.2d 230 (N.Y. 1975) (explaining the difference between the State's harmless error standard for nonconstitutional errors and the *Chapman v. California* standard which applies on direct Federal

review of constitutional errors; noting that the State rule for nonconstitutional errors is not as exacting as *Chapman* and rejecting applicability of *Chapman* in cases of nonconstitutional error).

A Federal court on habeas corpus review is limited to determining whether a conviction violates the Constitution, laws or treaties of the United States. See Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The dispositive issue in this case is whether the introduction of the arson investigator's opinion that he ruled out accidental causes of the fires amounted to a violation of Petitioner's federal constitutional rights. Although it is proper to elicit from the arson investigator testimony that, in the course of the investigation, he ruled out certain causes of a fire, but it is improper to allow the expert to invade the jury's province by testifying that the fire was intentionally set. *E.g.*, *People v. Avellanet*, 242 A.D.2d 865, 866 (App. Div. 4th Dept. 1997). There is New York State authority for the proposition that Investigator Rothfuss' testimony was not erroneous because he did not actually state a conclusion as to the ultimate issue in the case. *See People v. Maxwell*, 116 A.D.2d 667, 668 (App. Div. 2d Dept. 1986) ("During the course of defendant's trial for arson, two expert witnesses were permitted, over objection, to give opinions that the fires involved were not chemically, mechanically, electrically or naturally caused, thus eliminating all nonsuspect causes. Their testimony in that regard was not violative of the general rule . . . that an expert witness should not be allowed to testify that in his opinion a fire was incendiary in nature, since it does not actually state a conclusion as to the ultimate issue in the case, i.e., whether or not the fires were intentionally set."). Thus, it is not clear-cut that there was error under New York State evidentiary law in this case.

Even if there was error, not all evidentiary errors are of a constitutional dimension. The improper  admission of evidence against a defendant is not a violation of due process unless the

evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (citation omitted). In assessing prejudice, the court asks whether, in light of all the evidence, the erroneously admitted evidence was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998) (citation and quotation omitted). As discussed elsewhere in this Decision and Order, in light of the overwhelming evidence that the fires were not mere happenstance, the conclusion is inescapable that Narrod deliberately set the fires in the victim's house in furtherance of his ultimate intent to set the entire house ablaze. Thus, the admission of the objected-to testimony by the arson investigator, even if erroneous, was not so material as to result in a violation of Narrod's right to a fundamentally fair trial.

  **E.  Ground Two (Continued): Denial of Request for Adjournment**

  This allegation repeats an allegation made under Ground One, which is discussed above in this Decision and Order.

  **F.  Ground Two (Continued): Cumulative Trial Error**

  The Supreme Court has repeatedly stated that fundamentally unfair trials violate due process. *E.g.*, *Riggins v. Nevada*, 504 U.S. 127, 149, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (quoting *Spencer v. Texas*, 385 U.S. 554, 563-64, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967)). In addition, the Supreme Court has held that the prejudice from distinct constitutional errors under the Due Process Clause, when cumulated, can warrant reversal of a criminal conviction. *See Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("We need not decide, however, whether this error alone would occasion reversal since Chambers' claimed

denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses."); *see also United States v. Alfonso-Perez*, 535 F.2d 1362 (2d Cir.1976) (reversing conviction on direct appeal because of the cumulative negative effects of individual trial errors on defendant's right to a fair trial). Here, Narrod has not demonstrated the existence of multiple constitutional errors which he could aggregate for purposes of a cumulative error claim, assuming such a claim is cognizable on habeas review. Therefore, this claim does not provide a basis for relief.

### G.      Ground Three: Duplicitous Indictment

Narrod contends that he was denied due process by being charged in the indictment with one count of arson while the evidence at trial established that there were multiple fires set inside the victim's home. "A due process claim in a federal habeas petition alleging that a state prisoner was unable, based on lack of notice in the indictment, to adequately prepare his defense resulting in actual prejudice 'is largely one of state law, subject only to the general fourteenth amendment guarantees of due process.'" *Chandler v. Moscicki*, 253 F.Supp.2d 478, 486 (W.D.N.Y.2003) (Foschio, M.J.) (quoting *United States ex rel. Corozzo v. Attorney Gen. of State of N. Y.*, 475 F.Supp. 707, 709 (E.D.N.Y.1979) (citing *Peters v. Kiff*, 407 U.S. 493, 496, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (stating that the Fourteenth Amendment's general guarantee of due process is the appropriate measure of grand jury indictments because the requirements of the Fifth Amendment have not been applied to the states)).

Thus, "[t]he sufficiency of a state indictment cannot form the basis for the issuance of a writ of habeas corpus unless the indictment falls below basic constitutional standards. Those standards ensure a defendant the opportunity to prepare a sufficient defense by requiring that an

indictment inform the accused, in general terms, of the time, place and essential elements of the alleged crime." *Carroll v. Hoke*, 695 F. Supp. 1435, 1438 (E.D.N.Y.1988) (citations omitted). As the Second Circuit has explained,

> An indictment need only provide sufficient detail to assure against double jeopardy and state the elements of the offense charged, thereby apprising the defendant of what he must be prepared to meet. *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir.1973), cert. denied, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). Under this test, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime, *United States v. Fortunato*, 402 F.2d 79, 82 (2d Cir.1968), *cert. denied*, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969); *United States v. Palmiotti*, 254 F.2d 491, 495 (2d Cir.1958)[.]

*United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.1973); *accord, e.g.*, *DeVonish v. Keane*, 19 F.3d 107, 108-09 (2d Cir.1994).

Although creative, Narrod's argument is without merit. His indictment clearly meets the basic constitutional requirements of stating the time, place, and essential elements of the alleged offense–here, third degree arson. He was adequately advised of the nature of the charge against him so as to be able to mount a defense as well as to assert a double jeopardy claim if the state later attempted to retry him for the same criminal acts.

Furthermore, the indictment was not duplicitous. As required by C.P.L. § 200.30, the third degree arson count of the indictment charged only one offense. The gravamen of third degree arson, P.L. § 150.10(1), is not the number of fires that were set but rather that the defendant intentionally damaged a building by setting fire to it. The evidence presented at Narrod's trial overwhelmingly established that each of the several fires was intentionally set in the same building (McAllister's house), with the intent of damaging that one building. Thus, the indictment charging Narrod with third degree arson is not duplicitous or otherwise infirm. *See,*

*e.g.*, *People v. Stewart*, 307 A.D.2d 533, 533-34 (App. Div. 3d Dept. 2003); *People v. Clinkscales*, 134 A.D.2d 889, 889 (App. Div. 4th Dept. 1987).

In sum, Narrod has failed to establish that his indictment did not meet the relevant standards as defined by the United States Constitution. *See DeVonish*, 19 F.3d at 109 (denying habeas relief where petitioner argued that his indictment fails this constitutional test because it did not specify the particular crime petitioner intended to commit upon entering the two dwellings; court found that "[b]ecause an intent to commit a particular crime is not a material element of the offense charged, De Vonish's indictment satisfied the Constitution's minimum standards since it tracked the language of the New York burglary statute, and specified the approximate time and place of the alleged crime") (citing *Tramunti*, 513 F.2d at 1113)). Ground Three of the Petition is accordingly dismissed.

### H.     Ground Four: Violation of the Prosecution's Disclosure Requirements

As he did on direct appeal in his *pro se* appellate brief, Narrod here contends that his right to due process under *Brady v. Maryland* was violated by the prosecutor's failure to disclose the results of the DNA testing conducted on the cigarette found in the victim's body bag when it arrived at the morgue. At trial, the prosecution's DNA expert testified that the primary DNA profile on the cigarette butt was from the victim; there was a secondary DNA profile that was below the threshold for laboratory reporting. T.1394-95. Over defense counsel's objection, the DNA expert testified that the secondary profile appeared to be consistent with the DNA found on the Tahitian Treat soda bottle and the cigarette buts from the orange juice container. T.1396. As noted above, the DNA profiles on those items of evidence matched Narrod's DNA. T.1304. Narrod contends that because the profile was only a partial one, it should not have been

mentioned at all, and, moreover, trial counsel was never provided with "any type of advance notice that the prosecution expert witness was going to testify to a DNA 'match' in regards to People's [Exhibit] #90." Petitioner's *Pro Se* Supplemental Appellate Brief at 4, Resp't App.

Although Narrod frames this as a *Brady* claim, it rather seems to be an issue of allegedly erroneous expert testimony. However it is couched, the underlying factual allegations demonstrate that the claim does not entitle Narrod to habeas relief.

To the extent that Narrod is alleging a *Brady* violation, there was no "suppression" of "favorable" evidence. The prosecution turned over all reports of DNA testing, including the reports related to the cigarette butt discovered in the victim's body bag, on March 7, 2002. Specifically, the prosecutor supplied the defense with Monroe County Public Safety Laboratory Report 1980-00, report number 4, which indicated the presence on the cigarette butt of a DNA profile matching the victim's. An asterisked notation indicated that additional results were located on the butt that were below the reporting level. People's Appellate Brief at 40 (citing Appendix on Appeal at 199, 206-07). On August 12, 2002, about 49 days before trial, the prosecution turned over the DNA expert's notes, which indicated that the unreported results were consistent with Petitioner's DNA profile. *Id.* (citing Appendix of Appeal at 199-200, 210-12).

To the extent that Narrod alleges that the expert presented improper testimony, his contentions mischaracterize her answer. Contrary to Narrod's assertion, the expert did not state that the DNA on the cigarette butt "matched" his DNA profile; rather, when asked whether Narrod could be excluded as the source, she stated that it appeared consistent with his DNA profile. This opinion was within her field of competency as she was an expert giving testimony about DNA testing she herself had performed. The trial court did not abuse its discretion in

overruling defense counsel's objection. Defense counsel was free to cross-examine her on this topic, and he did so, eliciting from her the secondary profile was only a "partial" one and that a "full profile" would have been more informative. In any event, this piece of testimony was cumulative and immaterial, given the wealth of conclusive DNA evidence inculpating Petitioner. Thus, any error was harmless regardless of the standard used.

## I.  Ground Five: Insufficient Evidence to Support the Murder Conviction

In order to comport with the requirements of due process, a conviction may not be obtained "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . charged." In re Winship, 397 U.S. at 364, 90 S.Ct. 1068; *accord*, *e.g.*, *Einaugler v. State of New York*, 109 F.3d 836, 839 (2d Cir. 1997). A defendant raising a sufficiency challenge "bears a heavy burden because a reviewing court must consider the evidence 'in the light most favorable to the prosecution' and uphold the conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir.2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in *Jackson*)).  When a Federal habeas court conducts AEDPA review of a State court's sufficiency-of-the-evidence ruling, it must first look to State law to determine the facts necessary to constitute the crime, that is, the elements of the offesnse charged.  *Fama v. Commissioner of Corr. Servs.*, 235 F.3d at 811 (internal quotation marks omitted). "[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury," and thus a habeas court determining whether the evidence is sufficient to satisfy due process requirements will "defer to the jury's assessments of both of these issues."  *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996)

The jury convicted Narrod of intentional murder, see N.Y. Penal Law § 125.25(1), but aquitted him of depraved indifference murder, see id. § 125.25(2). A person is guilty of murder in the second degree under § 125.25(1) when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person . . . ." N.Y. Penal Law § 125.25(1). The affirmative defenses to this subdivision are not applicable in Narrod's case.

During the investigation, Narrod repeatedly told the police that he had never been inside McAllister's home. On direct appeal, however, Narrod conceded that he was present in McAllister's home, given the overwhelming amount of DNA evidence placing him at the crime scene. As noted above, Narrod's DNA was on a bottle of soda left near the trail of blood in the basement and also was on cigarette butts floating in an orange juice container on the dining room table. In addition, Narrod's fingerprints were found on the orange juice container and on the bottle of lighter fluid found next to the victim's body. There were bloody shoeprints in the basement conforming to a men's size 9½ Dexter-brand shoe; that was Narrod's shoe size, and he was known to wear those type of shoes. Narrod also conceded on appeal that the murder was intentional, given the nature of the injuries inflicted on the victim, who died before the fires were set. Narrod challenged, however, the sufficiency of the evidence linking him to the homicide.

Drawing all reasonable evidentiary inferences in favor of the prosecution, and deferring to the jury's assessment of the witnesses' credibility, a rational trier of fact easily could have concluded that the murderer and the arsonist were the same person–Narrod. The prosecution introduced evidence from Narrod's friends that he told them that he had walked by the victim's house on the night of the murder. That information, however, was never disclosed by the police to the media, and thus only the person who had killed the victim knew when the murder had

occurred. Narrod possessed additional information that only the murderer would have had known–he informed friends that the murderer returned to the house to burn it, and that the victim's corpse was not discovered for two days after the fires were set. Narrod thus knew that one person had killed McAllister and set fire to her house, despite his claims on direct appeal to the contrary. It was entirely reasonable for the jury to conclude, based upon the evidence presented at trial, that Narrod was that person.

**J.      Ground Six: Insufficiency of the Evidence Supporting the Third Degree Arson Conviction**

"A person is guilty of arson in the third degree when he intentionally damages a *building* or motor vehicle by starting a fire or causing an explosion." N.Y. Penal Law § 150.10(1) (emphasis supplied). The affirmative defenses to this subdivision are not applicable in Narrod's case.  Narrod argued on direct appeal that in light of the number of the fires that were set, the intention was not to damage the house itself but rather to damage objects inside the building. Drawing all reasonable evidentiary inferences in favor of the prosecution, and deferring to the jury's assessment of the witnesses' credibility, a rational trier of fact had ample evidence to conclude that the fires were set with the intent of damaging the building, not just objects inside it. First, Petitioner told his friends shortly after the incident that somebody had tried to go back and "set the *house* on fire." T.575 (emphasis supplied). Second, given that there were seven fires set throughout the victim's ranch-style house, using gasoline and lighter fluid, a conclusion that the arsonist merely meant to damage discrete objects inside the house is simply untenable. Third, the fires did not damage any objects in particular; rather, the arson investigation showed that the living room fire started on the wall; the hallway fire burned only the floor; one of the bedroom

fires burned the wall after being started on the floor; and the basement fire burned the wall from the floor to the ceiling. *See* T.492, 509, 517, 524. The evidence thus was overwhelming that the arsonist's intent was to incinerate the victim's entire house.

For the foregoing reasons, Narrod's challenges to the sufficiency of the evidence supporting the intentional murder and third degree arson convictions are without merit and are dismissed.

### K.    The Second Ground One, the Second Ground Two, and the Second Ground Three[4]: Ineffective Assistance of Trial Counsel

Narrod contends that trial counsel was ineffective in (1) failing to call any witnesses for the defense; (2) failing to introduce photographs of his fingerprint and the fingerprint found at the crime scene; (3) failing to call a DNA expert; (4) failing to call Michael Inclema "to refute" the testimony of Laura Baxter; (5) "allow[ing]" a "consciousness of guilt letter" to be put before the jury which contained references to an arrest on unrelated crimes; and (6) failing to pay attention during the testimony of several witnesses because he allegedly was affected by medication he was taking for a heart condition.

Narrod's claims of ineffective assistance of trial counsel are unexhausted. It is well established that a petitioner must have exhausted all state remedies before seeking federal habeas relief. *See* 28 U.S.C. § 2254(b)(1); *Daye v. Attorney Gen'l of N.Y.*, 696 F.2d 186, 190 (2d Cir.1982) (*en banc*), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). In order for a claim to be considered exhausted, it must have been presented fully and fairly in federal constitutional terms to the State courts. *See*, *e.g.*, *Duncan v. Henry*, 513 U.S. 364, 365-66, 115

---

[4]    Narrod has duplicate Grounds One, Two, and Three; these correspond to the seventh, eighth, and ninth point headings in the attachment to his Petition.

S.Ct. 887, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 30

L.Ed.2d 438 (1971); *Daye*, 696 F.2d at 191.A claim is exhausted if it has been "fairly presented"

to the state court. *Daye*, 696 F.2d at 191. To fairly present his claim, the petitioner must have set

forth for the state court all the essential factual allegations and legal premises he now asserts in

federal court. *Id.* "[I]f material factual allegations were omitted, the state court has not had a fair

opportunity to rule on the claim." *Id.*

Narrod's ineffective assistance of trial counsel claims have never been presented to the

State courts for review. They were not raised by Narrod's appellate counsel on direct appeal. Nor

did Narrod include them in his *pro se* supplemental appellate brief. Furthermore, Narrod did not

file any *pro se* post-conviction collateral motions for relief. Thus, these claims have not been

through one complete round of appellate review in New York, and the exhaustion requirement

has not been fulfilled. *E.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 854, 119 S.Ct. 1728, 144

L.Ed.2d 1 (1999).

.A federal claim that is procedurally defaulted by state law "meets the technical

requirements for exhaustion" because "there are no state remedies any longer 'available' to [the

habeas petitioner]." *Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640

(1991); *accord, e.g.*, *Grey v. Hoke*, 933 F.2d at 120.  Under former  New York Court of Appeals

Rule 500.10(a),  New York "permit[ted] only one application for direct review[.]" *Spence v.

Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000) (quoting

N.Y. Ct. App. R. 500.10(a) (1999)).  The rule has since been amended, and criminal leave

applications are now addressed in N.Y. Court of Appeals Rule 500.20. *Colon v. Connell*, No. 07

Civ. 7169(BSJ)(JCF), 2009 WL 2002036, at *6 n.4 (S.D.N.Y. July 9, 2009). While this section

does not specifically state that there may be only one application for appeal, *see* N.Y. Ct. App. R. § 500.20, "such a restriction may be inferred." *Colon,* 2009 WL 2002036, at *6 n.4. First, N.Y. Court of Appeals Rule 500.20(d) and C.P.L. § 460.10(5) provide a 30-day window for any such application to be filed, and "this time limit would be meaningless were multiple applications permitted." *Colon*, 2009 WL 2002036, at *6 n.4. Second, N.Y. Court of Appeals Rule 500.20(d) provides that a request for reargument or reconsideration of an appeal may not raise any new points, implying that a wholly new request for leave to appeal would be impermissible. *Colon*, 2009 WL 2002036, at *6 n.4 (citing *Roa v. Portuondo*, No. 02 Civ. 6116, 2007 U.S. Dist. LEXIS 74387, at *32-33 (S.D.N.Y. Oct. 5, 2007) (declining to review issue that petitioner had failed to raise on direct appeal); *Murray v. Williams*, No. 05 Civ. 9438, 2007 WL 430419, at *8 (S.D.N.Y. Feb.8, 2007) (same); *Oquendo v. Senkowski*, 452 F. Supp.2d 359, 368 (S.D.N.Y.2006) (same)); *see also Harden v. LaClaire*, No. 07 Civ. 4592(LTS)(JCF), 2008 WL 783538, at *14 & n.12 (S.D.N.Y. Mar. 26, 2008) (same), *report and recommendation adopted*, *Harden v. LaClaire*, 07CIV4592LTSJCF, 2008 WL 4735231 (S.D.N.Y. Oct. 27, 2008).

Were Narrod to seek collateral review in state court of the ineffective assistance of trial counsel claims by means of another C.P.L. § 440.10 motion to vacate the judgment, the motion court would be mandated to deny the claim pursuant to C.P.L. § 440.10(2)(c) (mandating dismissal of claim if it could have been raised on direct review but was not). *See Reyes v. Keane*, 118 F.3d at 139 ("Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record."). When the alleged errors by trial counsel are "particularly well-established in the trial record," *Sweet v. Bennett*, 353 F.3d

135, 140 (2d Cir. 2003), the claims are subject to mandatory dismissal under C.P.L. §
440.10(2)(c).

Because Narrod no longer has remedies available in state court, his claims must be
"deemed" exhausted. *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S.
1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). However, the mechanism by which the claims are
constructively exhausted also creates a State-court procedural default. Thus, habeas review is
barred unless Narrod can establish cause and prejudice for the default, or demonstrate that failing
to consider his federal claims will result in a "fundamental miscarriage of justice," see, e.g.,
Harris v. Reed, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), which requires a
showing of "actual innocence." Narrod has shown neither cause for his default nor prejudice
resulting therefrom. Moreover, he cannot demonstrate that dismissal of his petition, without
addressing the merits of the defaulted claims, would amount to a "'fundamental miscarriage of
justice.'" *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir.2006), *cert. denied sub nom. Jimenez v.
Graham*, ___U.S. ____, 127 S.Ct. 976, 166 L.Ed.2d 740 (2007) (quoting *O'Sullivan v. Boerckel*,
526 U.S. at 854). Narrod has not attempted to make any such showing, and indeed I find that on
the record before me, he cannot do so. He therefore cannot overcome the procedural default, and
habeas review of the ineffective assistance of trial counsel claims is precluded.

## V.     Conclusion

For the reasons set forth above, Petitioner Dustin Narrod's request for a writ of habeas
corpus is denied and the petition is dismissed. Because Narrod has failed to make a substantial
showing of the denial of a constitutional right, *see* 28 U.S.C. § 2253(c)(2), the Court declines to
issue a certificate of appealability.

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:       February 4, 2011
             Rochester, New York